### KILLIAN et al. v. BADGETT et al.

CONTRACTS—*What proof of incompetency of parties necessary to set aside.*— Where a deed or contract is regularly made, the competency and · capacity of the parties to contract are presumed, and a Court of Chancery will not set aside or ·rescind such contract, unless the proof shows imposition, fraud or undue influence, with weakness of mind in the making or procuring of such deed or contract.

#### APPEAL FROM PULASKI CHANCERY COURT.

Hon. T. D. W. Yonley, *Chancellor.*

*Watkins & Rose and M. L. Rice,* for Appellant.

The bill charges that Killian obtained the conveyance from his wife by taking advantage of the weakness of her mind, occasioned by excessive use of morphine, and ill-health.

The answer directly denies this, and is good, unless contradicted by two witnesses, or one with strong corroborating circumstances. *Burr vs. Burton,* 18 *Ark.,* 214; *Spence vs. Dodd,* 19 *Id.* 166.

Old age, failing health, and failure to recollect or understand certain transactions, will not alone be sufficient to prove incapacity to make a will. *Clarke vs. Davis,* 1 *Redfield,* 249. Evidence of habits of intemperance and occasional fits of wildness, though indicating an impaired mind, ·do not establish a want of testamentary capacity. *Fulke vs. Adam, Id.* 454. Whoever alleges want of mental capacity in another must prove it. *Delafield vs. Parish,* 25 *N. Y.,* (11 *Smith,*) 9 ; *In re Coffman,* 12 *Iowa,* 491. Undue influence must be proved, and cannot be inferred from the mere relationship of the parties. *Wright vs. Howe,* 7 *Jones, Law, N. C.,* 412. When a testator had some insane delusions, but had mind enough to know and appreciate the character and effect of the dispositions of his will, it was held to be valid. *Dunham's Appeal,* 27 *Conn.,* 192 ; *Van Pelt vs. Van Pelt,* 30 *Barb.,* 134. A person not competent to transact the ordinary business of life may yet make a will. *Stubbs vs. Houston,* 33 *Ala.,* 555.

*Garland & Nash*, for Appellees.

Imbecility or mental weakness must constitute an ingredient, and a most material ingredient, in examining whether an instrument be invalid by reason of fraud or imposition, or undue influence. *Hill on Trustees*, *s*. 154; 1 *Story's Eq. J.*, *Sec.* 235, 238; *Wheelan vs. Wheelan*, 3 *Cowen R.*, 537; *Dent vs. Bennett*, 7 *Simons R.*, 539; *S. C.*, 4 *Mylne & Craig*, 269; *Toutside vs. Sherwood*, 1 *Brown Ch. R.*, 558; *Brice vs. Brice*, 5 *Barb., S. C. R.*, 533; *Birdsong vs. Birdsong*, 2 *Head*, (*Tenn*) 289.

WHYTOCK, *Special Sup. J.*—This is an appeal from a decree of the Pulaski Chancery Court, rendered on the 29th day of July, 1868. The suit was commenced by the appellees, Badgett and wife, for the purpose of cancelling a deed in trust, executed by Milus A. Killian and Elizabeth Killian, his wife, to defendant, William B. Badgett, as trustee. The deed bears date the 28th day of May, 1861. The complaint charged that it was procured from Mrs. Killian by the fraud and misrepresentations of the defendant, Milus A. Killian, her husband.

The Chancery Court decreed that the title to the lands described, that is to say, lots one, two and eleven, as designated in Governor Pope's survey and sub-division of the one thousand acre grant, made by the United States, to the State of Arkansas, for the purpose of building a court house and jail, and the south-west quarter of the north-west quarter, and the north-west quarter of the south-west quarter of section twelve; all in township one, north of the base line, of range twelve, west of the fifth principal meridian, situate in the county of Pulaski, just below the city of Little Rock, and containing, by estimate one hundred and ninety-eight $\frac{69}{100}$ acres, more or less, to be in the complainant, Lucetta S. Badgett, as the child and only heir at law of the said Elizabeth Killian, deceased. It appears that Mrs. Badgett was the daughter of Mrs. Killian by a former husband. The Chancery Court further decreed that the title to the lands be quieted. The admin-

istratrix and heir at law of defendant, Milus A. Killian, appealed from the decree.

The complaint charges that, by the deed in question, these lands were conveyed, as stated, through the fraudulent representations and undue influence of defendant, Milus A. Killian; that Mrs. Killian owned the property in her own right, and that the deed thus obtained from her, contained the following conditions : "To William B. Badgett, in trust, nevertheless, that the said Milus A. Killian, and the said Elizabeth, his wife, for and during the term of their natural lives, respectively, without impeachment of, or any manner of waste, should have, hold, use and enjoy the same, and receive and enjoy the rents and profits thereof; and upon trust also, that the said William B. Badgett, upon the written request of the said Milus A. Killian, and the said Elizabeth, his wife, or the survivor of them, might, at any time, and should, upon such request, mortgage or sell the said tract of land or any part or parcels of land, or any part or parts or portions thereof; and that the said Milus A. Killian, and the said Elizabeth, his wife, or the survivor of them, should receive the entire consideration arising from such mortgage or sale, and that the said William B. Badgett, or any trustee that might be appointed, should have full power to make valid titles, in such cases, and if no such disposition should be made of such tracts of land and premises, then, at the expiration of the said life estates, the remainder should descend to the heirs of the said Elizabeth."

The separate answer of Milus A. Killian, admits these terms of the deed.

It is further charged, in the complaint, that at the time of the execution of this deed, Mrs. Killian was upwards of sixtythree years of age; that she was infirm of mind and body; that she had been, during the fifteen years previous, addicted to the constant and excessive use of opium in some of its forms; and that she was, from the weakness or imbecility of her understanding, superinduced by the use of opium, inca-

pable of executing the said deed, or of knowing its full purport. It is also charged that her husband, said Milus A. Killian, took advantage·of the weakness of understanding, used undue influence to procure the execution of the deed by her, and misrepresented to her its legal effect.

The defendant, Milus A. Killian, in his answer denies these charges, but admits that Mrs. Killian used morphine inordinately and habitually. He alleges that the deed was prepared according to Mrs. Killian's express wishes.

The transcript is voluminous, and the depositions submitted are numerous, and some of them of great length.

It will be seen, from the foregoing statement of the case, that the question presented to the court, turns mainly upon the determination of the fact as to the condition of Mrs. Killian's mind at the time she executed the deed.

We have carefully examined the transcript, and repeatedly read and compared the various depositions. Mrs. Killian, at the time she made the deed, was about fifty-three or fifty-four years of age. She had complained considerably of her health, which is proved not to have been very good for several years before this time, but it also appears that she generally attended to or supervised her household duties. She died in July, 1862. The witness, whose testimony is greatly relied on by the complainants, to establish the charge of imbecility of mind, is William B. Badgett. He was the eldest son of the complainants, and at the time of·the execution of the deed, was twenty-five or twenty-six years of age. He thinks that his grandmother displayed much mental imbecility in her fondness for a pet lap dog, and seems to think that the delight she manifested in being out of doors in the springtime, at work in her garden, was a sign of weakness. He states that she purchased a great deal of morphine, and would sometimes talk in a childish manner. He fails to specify any other alleged foolish acts on her part; but other statements in his deposition, indicate that she conversed with him very sensibly about the property, and her personal affairs. Mrs. Kil-

lian, evidently was quite fond of him, talked to him frequently about the disposition of her property, and he apparently regarded himself really and directly entitled to her estate, after her decease. Perhaps the mind of the witness was somewhat tinctured with an impression of disappointment that this hope was not realized.

The next witness, for complainants, is Didimus Lewis, a young man, who testifies that he was twenty-three years of age; that he was quite intimately acquainted with Mrs. Killian, during the last three or four years of her life, and had conversations with her of a general character. He says her health was often bad; that she used large quantities of morphine, but that she attended to her household affairs, superintended the selling of eggs, vegetables, etc., and with the exception of taking morphine, conducted herself like any other woman. She spoke to him about her property, and seemed anxious that it should go to William Badgett, or to her grandchildren. This witness further declares that he "never saw her do anything which showed a want of common capacity."

John Peyton, another witness for complainant, testifies that he lived with Dr. Killian's family during the year 1861; that Mrs. Killian complained of her health; that she took morphine, but he did not know how much; that she "was a smart woman when she was at herself." The depositions of the witnesses, Kingston and John and Mrs. Reynolds, on the part of the complainants, are of like general purport, excepting that they state that they had known Mrs. Killian for a longer period.

These are all the depositions submitted on the part of the complainants, except those of the two physicians who were called upon to give their opinion as to the effects produced upon a person by the excessive and inordinate use of morphine. It is apparent that their opinions were given on an assumed state of facts, or as it was to them, a hypothetical case. They agree that morphine taken excessively would

impair the faculties, but that generally it would depend much on the fact as to whether the person was accustomed to its use, and the quantity taken, etc.

The depositions of the following named witnesses are presented on behalf of the defendants:

Mary Clark testifies that she lived with Mrs. Killian for seven years, and was living there when Mrs. Killian died; that she had very good general health, but had, at one time, a bad spell of erysipelas; that she attended to her household duties very regularly, and also to selling articles for market; that witness never saw anything in her that led witness to suppose her mind was affected; that Mrs. Killian took morphine at regular times; that witness had fixed up doses for her; that witness herself, and some of the negroes on the place, often used morphine; that she repeatedly expressed a wish to have Dr. Killian and herself have a living out of her property, and that she appeared, to witness, to be a "smart woman."

The next witness, Dr. Peyton, testifies that he was the family physician of Mrs. Killian for many years; that she was a "sensible, practical business woman;" that he never saw her suffering from the effects of morphine, except that it sometimes produced costiveness; that she sometimes suffered from chills, but that she seemed to be in better health just previous to the year 1861 than before that time; witness never heard, in her lifetime, that she was not of sound mind; never had such a thought himself. He did not consider her a robust woman.

Nancy Davis testifies that she had been acquainted with Mrs. Killian for sixteen years, and saw her often; that complainants did not visit Mrs. Killian much. In other respects this witness states substantially the same facts as the two preceding witnesses.

Dr. James L. Moore testified that he was acquainted with Mrs. Killian; had been since 1858; had staid at her house, and seen her often; never saw a want of capacity; that, in

business matters, she was "sharper than most women," and although she was not a woman of education, she seemed to have read some and conversed very well about what she had read. This witness agrees in substance with the last witness as to her health and her moderate use of morphine.

The next witness, Mr. Pope, testifies that he was the Justice of the Peace who took Mrs. Killian's acknowledgment to the deed in controversy; that he had been acquainted with all the parties for many years; that the deed was left in his custody a day or two before he had time to visit Mrs. Killian to take her acknowledgment; that when he visited her for that purpose, she appeared lively and cheerful and pleased to see him; that he handed her the deed and told her his business; that he remarked to her that he supposed she was acquainted with the contents; that she answered that she was; and that being examined apart from her husband, she said she executed it willingly and without compulsion or undue influence of her husband; that witness always thought her "a woman of a remarkably shrewd, intelligent mind," and that, at the time mentioned, he was at the house altogether for half an hour.

The witness, Mary Scroggins, testifies that she had known Mrs. Killian for about three years before her death; had lived near the Killians, and had visited Mrs. Killian nearly every day and sometimes oftener; had talked to her about her affairs and about Justice Pope's visit; had talked with her about the deed; that she stated that she now had it fixed; had often heard her say that she never intended that complainants should have her property; that witness had written letters for Mrs. Killian; had done her sewing and cutting for her; and that her use of morphine did not seem to affect her judgment.

Amanda Robbins, another witness, testifies that she had lived a neighbor to Mrs. Killian for three or four years just before her death; that she was a woman of good sense; that her health was not very good.

The deposition of Rev. N. P. Ratcliff shows that he had

been acquainted with Mrs. Killian since 1833 and until 1862, and had always considered her sound in mind.

Mary Jaynes, another witness, testifies that she knew Mrs. Killian; that she never heard it intimated that she was of unsound mind; that she used morphine habitually, but she saw no bad effects from the use of it; that she was an intelligent, though uneducated woman, and a close calculator; that she spoke to witness about the deed and expressed herself satisfied with the disposition she had made of the property.

James A. Henry, a witness, testifies that he has been acquainted with Mrs. Killian since 1849, and was to the time of her death; that he used to sell her goods frequently, and never knew or heard that she was of unsound mind; that she sometimes complained of her health.

Dr. R. F. Jaynes testifies that he never heard Mrs. Killian's state of mind questioned before her death. The rest of this witness' evidence is substantially like that of Dr. Moore.

It further appears, in the evidence, that Mrs. Killian and her husband lived pleasantly together.

We consider these facts, as they are presented to us in the case, and decide that the charge of fraud, imbecility and undue influence, set forth in the complaint, are not sustained. We think the evidence decisively establishes the fact that Mrs. Killian, at the time she executed the deed in question, was neither of imbecile mind, nor, so far as can be discovered here, was any imposition or fraud practiced upon her by her husband. The proof shows that she was a sensible woman, watchful of her interests and knew what she had done. That while it is true she used morphine, she does not seem to have done so to excess, or so as to affect her mind. The witnesses who were her daily companions and had been acquainted with her for a long period, amongst whom was her family physician, never made the discovery that she was of unsound mind, but, on the contrary, they, with great unanimity, describe her as "a smart managing woman."

Counsel for complainants have asserted in their arguments

in the case, that they willingly rest it on the authority of *Birdsong vs. Birdsong*, 2 *Head. Tenn.*, 289; *Beller vs. Jones*, 22 *Ark.*, 92, and *Kelly's heirs vs. McGuire*, 15 *Ark.*, 555. What was the state of facts presented in those cases? In *Birdsong vs. Birdsong*, it was proven that the brother of the defendant, and who was the complainant in the case, was of very ordinary capacity and easily overreached even when sober, and the court said that the proof showed him to have been poor, degraded and destitute. It also appeared that the defendant had practiced a gross imposition upon his debauched brother in procuring the deed described in that case. In commenting on the general principle, however, the court in that case remarked, "that contracts will not be avoided unless it appears that undue advantage has been taken by one party of the conditions of the other," through weakness of mind or feebleness of character.

The case of *Beller vs. Jones* was brought for the purpose of setting aside a contract, about which the court said there existed "a permanent misunderstanding." That Jones, the plaintiff, was proven to be a credulous man, liable to be led away by those in whom he confided, and that he had, for some time previous, been subject to great depression of spirits and distress of mind from unhappy domestic relations, to such an extent that induced the generality of his neighbors to suppose him to be impaired in mind. That Beller, the other party, had practiced a misrepresentation or imposition upon him, and had also failed to comply with his own undertakings in the contract. It further appeared that Jones, by the deed in that case, had conveyed all his property, involving the rights of several children. The court placed much stress upon the fact that, by the contract entered into by Jones, the children were to be torn from their home and their only parent, and committed to the care of one who might have no feeling for them, and whose interest was to have them refuse to live with him, that he might be free from an onerous part of the agreement. The court then comments

as follows: "But it does not follow that a court of chancery will rescind a contract because it would not be enforced. There must be imposition, fraud, or undue influence, with weakness of mind, to call into exercise the power of cancelling the acts and contracts of beings who are supposed to take care of themselves, or suffer from their folly. But for such a contract (as that one) to stand, the defendant should show a compliance with his undertaking."

In the case of *Kelly's heirs vs. McGuire*, the court says: "The conveyance was made by Greenberry Kelly to James Kelly, his nephew, in consideration of love and natural affection, and purported to convey, without any reservation, all the real and personal property in Arkansas or elsewhere, which had descended to the donor, or to which he was entitled as the representative of his grandson. The donor, at the time of this transaction, had passed the period usually allotted to human existence. He was in the last stage of second childhood, with his physical energies wasted and his mental powers decayed. A century had passed over his head and still he lived, as he had been living for the last twenty-five years, the recepient of the public bounty; and long before the execution of the deed, his memory was so impaired as to render him unconscious of events, and he appears to have been as ignorant of what was going on in the world, as if he had not existed at all. He was undoubtedly a very infirm and feeble old man, usually in bed; had been afflicted with general palsy for at least twenty-five years; was partially deaf; had been an intemperate man and would become intoxicated whenever opportunity offered; was never known to have property or to transact business or to make contracts, and was incapable of managing or taking care of it." The court describes James Kelly, the nephew and donee, who had procured the deed from this imbecile centenarian, as a 'shrewd trader, who had amassed a large fortune in trafficking in the southern States, and as a person who seemed not to have been over scrupulous in exercising his influence for the benefit of

himself over the donor, and to have kept an eagle eye on the property, until he acquired it by the deed in question."

While we approve the principles established in these cases, they present, as we have intimated, a widely different state of facts from the one before us. *Blanchard et al. vs. Nestle*, 3 *Denio* 37.

Holding, as we do, the deed in question was a valid one, the complaint in this case, must be dismissed.